WHITE, JOSEPH S., Associate Judge.
This is a “wrongful death” action. Appellant’s husband was killed in a traffic accident. He was crossing a public street on foot when he was struck by an automobile driven by the appellee. Hereafter the parties will be referred to as they were in the lower court — the appellant as the plaintiff and the appellee as the defendant.
Plaintiff appeals from a final judgment for the defendant following a jury trial at which the jury returned a verdict for the plaintiff. The verdict was vacated by the trial judge when he granted defendant’s motion for a directed verdict, ruling upon which had been reserved during the trial.
Neither a motion for new trial nor a motion for judgment notwithstanding the verdict was filed. Following the trial the trial judge simply “heard further argument of counsel on said motion for directed verdict” and ruled that deceased “was as a matter of law guilty of contributory negligence”.
The accident happened on Colonial Drive in the City of Orlando at approximately 8:30 o’clock in the evening during the month of May. Colonial Drive extends in an easterly and westerly direction. It was a four-laned, paved street with two lanes for east bound traffic and two lanes for west bound traffic. As is customary in such situations, a double yellow line was painted down the center. Each line was six inches wide, with six inches between, so that the two yellow center lines occupied eighteen inches of the center of the street. There was nothing unusual about the weather. Two large shopping centers were nearby, one on the south side of Colonial Drive, and one on the other. Traffic was moving in both directions at the time in the traffic lanes provided therefor. The deceased was attempting to cross Colonial *509 Drive at a point approximately 150 feet east of an intersection where a traffic light was in operation.
The witness, Inez Sullivan, described the occurrence thus:
“Mr. Sullivan and I were riding in our automobile in a westerly direction on Colonial Drive when we noticed a man, later identified as Mr. Emil Bohlmann, attempt to cross Colonial Drive east of the intersection of Colonial and Bumby Streets. We were then about 250 feet from him going west in the north or outside lane. Mr. Bohlmann had on light clothing, a light shirt and the pants were a little darker. He wasn’t carrying any packages. At the place where he attempted to cross, there was no crosswalk or traffic signal devices. Mr. Bohl-mann walked to the center of the street and stopped and held his position. He looked to the right and to the left. I then saw another car, which I later learned was driven by Carl Booth, approaching from the west in the north lane going east. I observed nothing unusual about his driving. When the Booth car was about 18 feet from him, Mr. Bohlmann, to my surprise, took one step into the path of the Booth car. He stepped off the center line[s] into the lane driven by Mr. Booth. He came into contact with the Booth car on the left front fender, on the rounded corner of the fender left of the left headlight. I refer to the left fender, meaning the left from the driver’s standpoint. The side where the driver sits. The car hit him and knocked him in the air. We pulled over to one side in the Winn-Dixie Parking lot and went over to where this man was on the street. The car that hit him had stopped immediately, and the driver got out and went over to where Mr. Bohl-mann was. Mr. Bohlmann was lying with his head north and his feet south. His head was on or over the center line[s]. Mr. Booth kneeled beside Mr. Bohlmann and said, ‘Oh my God.’ I did not smell any alcohol about Mr. Booth. He appeared steady on his feet to me. I then went to our car and got a blanket to put over Mr. Bohlmann. When I returned with the blanket, the driver of the car, Mr. Booth, was gone; and I didn’t see him again until the next morning at City Hall when I learned that his name was Carl Booth. The Booth car made light skid marks and stopped within its length from the point of impact. I noticed there were some things in the street and went over and looked. It was Mr. Bohlmann’s shoe, his eyeglasses and some green stamps. I picked them up. The papers were all scattered about the center of the south lane going west. The shoe was about 21/2 feet east of the back wheel of the car and about in the center of the lane. The glasses were about feet or 2 feet farther on northeast of the shoe. The stamps were lying about a foot south of the glasses. All of these things were north of the center line[s]. I observed the position of the Booth car after it came to rest. The left front wheel was about one foot and one-half north of the north edge of the center line[s]. If the left rear wheel wasn’t over the center lines, it was right on them. Mr. Bohlmann was walking in a normal manner. He stopped on the center line[s] in the middle of the street, held his position and looked in both directions. I don’t recall any other cars, any other pedestrians or any other objects on the highway. We were 25 or 30 feet from Mr. Bohlmann when he was struck by the Booth car. I do not recall whether there was any traffic in the south lane or east bound traffic that would have prevented Mr. Booth from pulling to the right and into that lane. I do not recall whether there was any traffic behind Mr. Booth. Our car was going about 25 miles an hour as it approached Mr. Bohlmann. The other car was going about the same.”
*510 The defendant testified:
“On the evening of May 19, 1961, I was driving my car in about the center of the inside east-bound lane on -Colonial Drive. I did not stop at the Bumby and Colonial Drive intersection, because the traffic light was green. I was driving approximately 25 miles •an hour as I approached the intersection, and I slowed down to approximately 15 miles an hour, and then, as I passed the intersection, I started to pick -up a little speed and I was going approximately 25 miles an hour immediately ;prior to applying the brakes. When I •first saw the pedestrian, he was 100 or •so feet away in the inside lane for west-bound traffic. He stopped in the -center of the street and looked both ways. I turned around and looked ■over my shoulder to see if I could pull in the outside lane if necessary, and ■saw headlights to the rear. As I looked around in front again, he was still in the middle of the street on the •center lines. And I was pretty close to him at that time. I could not turn to the right; I did not have time. He then took a step in front of me, and •my car struck him. I don’t know how -close I was to him when I saw him looking my direction, it all happened so fast. I had no difficulty in seeing Mr. Bohlmann at any time. The only time I didn’t see him was when I turned ^around. My car was a Buick Special. I saw Mr. Hutchinson at the scene of the accident. I told him I had been involved in an accident. I had had no •drinks that evening. There was no bottle of liquor in my car. I slowed to about fifteen miles per hour as I passed through the green light at Bumby and proceeded on west [east] on Colonial, picking up speed to about twenty-five miles an hour. My turn was the next intersection. I saw the pedestrian walk to the center of the road and stop in the center of the street on the center line. He looked both ways and straight at me, and he held his position. He was not in the path of my car. He was in a safe position so far as my car was concerned. I was in the left lane of the westbound traffic. I glanced to my right rear to see if I could safely change lanes. My car has a blind spot at its right rear not viewable in my mirror and I never change lanes in multi-laned traffic without checking to the immediate right rear of my car by glancing backward. Just as I glanced back forward, when my car was about eighteen feet from him, Mr. Bohlmann took one step into my path. I slammed my brakes full on but it was too late. I think my car struck him at the very instant I hit the brakes. Mr. Bohlmann struck my left front fender to the left of my left headlight, on the rounded corner of the fender. Not on the front of the fender and not on the side of the fender, but on the rounded corner. At the time I slammed on brakes I may have turned the wheel of my car. I don’t remember whether or not I turned to the left or right or if I turned at all. I may have turned to the left. I made a panic stop. I slammed the brakes full on.”
In contrast to defendant’s testimony, a police officer called to the scene stated:
“I found on the front seat of the car a fifth bottle containing what appeared to be whiskey. The contents were from one third to one half gone. It was either half full or two thirds full. The seal had been broken. There were no leaks about the bottle. Officer Cozart unscrewed the cap, and I smelled the contents. It smelled like whiskey to me. As a military policeman in the service, I have smelled considerable whiskey. I had taken a course at the Orlando Police Academy in chemical testing for intoxication. As far as I know, the bottle was left in the automobile when the car was taken away. There were no stains, or wet spots on *511 the seat which could have shown that the bottle had leaked out. The center lines on the street were two yellow lines with a space between them. They were standard lines. I saw Sergeant Gatrell in the street and told him we were attempting to locate the driver. The next time I saw him, he was exiting from the Winn-Dixie Store with a man in custody. There was a parking space between the highway and the store. The man in custody was Carl Booth, whose clothing was disheveled. Sergeant Gatrell had him by the arm. This was ten or fifteen minutes after I arrived at the scene of the accident. He was searched and placed in the rear seat of the police car and taken to the Orlando Police Department by Patrolman Kimbro. I then went to the Police Department, and saw Mr. Booth in the booking office. I smelled his breath at the time. It smelled of the odor of intoxicants. I noticed his facial appearance when we put him in the police car. His face was flushed. His speech was slurred and difficult to understand. I attempted to talk to him, but did not get any replies that I could understand. At the Police Station, I asked him to walk a straight line. He did, and started to lose his balance. He refused to take any further test.”
Another police officer testified to this effect:
"He was very rigid, and stared straight forward. He walked in a very rigid manner toward the door at the front of the store. As we got outside, he started to stumble, and I had to place my hand on his arm to steady him. I took him back to the scene of the accident, and turned him over to Officer Cozart, who was one of the team of the accident investigation. There was a strong smell of an alcoholic beverage on the man’s breath, and his eyes were bloodshot and watery. There were tears in Mr. Booth’s eyes and as we started back to the scene of the accident, he seemed to collapse all1 at once becoming unsteady on his feet, so that I had to assist him. I first. notice[d] the strong smell of alcohol', on his breath as I was asking him some-questions in the Winn-Dixie Store. I. asked him for his driver’s license, but: he made no effort to give it to me. He-was not doing anything in particular' there, just standing facing the door. T later learned his name was Carl Booth.. I asked him if he was the driver of the car. There was no answer. I asked: him had he been drinking and there-was no answer. I asked him why he-had left the scene of the accident, and', there was no answer. I led him shortly after we left the Winn-Dixie Store to-Mr. Booth’s automobile, and I still maintained a hold on him until we got him. in the police car, because of his wobbling condition. When we got to the-scene of the accident, Mr. Cozarfc showed me a bottle of liquor he said he-had found in the Booth car. Mr. Booth, was right there in our immediate presence at the time, but he said and did' nothing.”
Skidmarks and the position of other-objects material to the controversy were, described in detail.
Such evidence raised issues of fact which were properly submitted to the-jury. In Lientz v. Holder, Fla.1957, 95 So.2d 505, it was said that whether the-driver of an automobile has maintained adequate control of his vehicle as required by the circumstances of each case is a question of fact to be weighed and’, considered by the jury. An oft repeated' rule is that ‘“[i]f the evidence is in dispute and presents to the minds of reasonable men potentially different conclusions and inferences in the light of the circumstances of a particular case, then the problem of resolving the conflicts is-the responsibility of the jury.’ ” Lientz v. Holder, supra.
*512 In considering the contributory-negligence of an injured party in a case such as this it is important to remember that it is not every act of negligence on the part of the injured party that will bar recovery. It is only when negligent acts on the part of the party injured form a direct and proximate causal relation or contribute in some appreciable degree to the injury that recovery is precluded. Bessett v. Hacket, Fla.1953, 66 So.2d 694.
The contributory negligence of the injured party is not considered to be the proximate cause of his injury if it be shown that defendant, by the exercise of reasonable care and prudence, might have avoided the consequences of the injured party’s negligence. The party who last has a clear opportunity of avoiding an accident, notwithstanding the negligence of the other, is considered solely responsible for it.
For a thorough and informative discussion of the “Last Clear Chance” doctrine see the special concurring opinion of Mr. Justice O’Connell in Connolly v. Steakley, Fla., 197 So.2d 524, opinion filed January 25, 1967.
The position of the automobile where it came to rest, the skidmarks, and the location north of the center lines of deceased’s personal belongings were all silent witnesses from which conflicting conclusions and inferences might be drawn.
Whether defendant maintained proper control over his automobile, or whether he had an opportunity to avoid deceased’s negligence, or whether defendant was under the influence of intoxicating liquor, and, if so, whether his condition had some bearing upon defendant’s failure to avoid deceased’s perilous position, were questions to be decided by the jury.
Upon comparison of the facts in the case now before the court with those in Connolly v. Steakley, Fla.App.1964, 165 So.2d 784, and Burks v. Grundman, Fla. App.1966, 189 So.2d 511, a clear distinction is demonstrated. The present case falls in the category of Whitten v. Erny, Fla.App.1963, 152 So.2d 510.
The difference in the circumstances which warrant the granting of a motion for directed verdict and a motion for new trial are discussed in Hilkmeyer v. Latin American Air Cargo Expediters, Fla.1957, 94 So.2d 821.
Cross-assignments of error have been considered and found to be without merit.
The final judgment for defendant is reversed with directions to re-instate the verdict and enter judgment for the plaintiff.
Reversed.
WALDEN, C. J., and CROSS, J., concur.